[No. 13614.    Department One.    December 6, 1916.]

VANCE LUMBER COMPANY, *Appellant*, v. UNITED STATES TRUST COMPANY, *Respondent*.[1]

PRINCIPAL AND AGENT—RELATION—BANK AS COLLECTING AGENT—EVIDENCE—SUFFICIENCY. A bank collecting and holding on deposit for a logger the proceeds of the sales of certain rafts of logs, is not shown to be an agent to collect or disburse all or any part of the proceeds for the benefit of the owner, under a stumpage contract whereby the logger agreed to pay $2.85 per thousand for logs cut as soon as they were sold; where it appears that the logger made payment, either through the bank or directly, for the first rafts sold, that the bank was helping to finance the logging operations, advancing money to the logger, who at times overdrew the account, and that the bank, in making collections from the purchasing mills, was acting under the directions of the logger and making only such disbursements as directed by him; it further appearing that the logging operations took up the whole of the proceeds, leaving insufficient to pay the stumpage under the contract.

TRUSTS—IMPLIED TRUSTS—EXISTENCE—DEPOSIT IN BANK—KNOWLEDGE OF DEBT. A bank, collecting the proceeds of logs sold by a logger, under his direction, would not be a trustee to the extent of the stumpage due, by reason of knowledge that the stumpage was to be paid upon the sale of the logs, where the stumpage contract did not create any lien on the logs or any right to the first proceeds, but only the relation of debtor and creditor.

Appeal from a judgment of the superior court for Grays Harbor county, Sheeks, J., entered February 29, 1916, upon

[1]Reported in 161 Pac. 341.

findings in favor of the defendant, in an action for money received, tried to the court. Affirmed.

*W. H. Abel*, for appellant.

*Hogan & Graham*, for respondent.

CHADWICK, J.—Appellant, Vance Lumber Company, and one C. W. Jensen entered into a logging contract. It was therein agreed that appellant would sell all the merchantable timber upon a certain portion of sections 29 and 32, township 17 north, range 5 west; that Jensen would cut the timber and market the same at the mills upon Grays Harbor. The material parts of the contract follow:

"It is agreed by and between the Vance Lumber Company, a corporation, hereinafter called the party of the first part, and C. W. Jensen, hereinafter called the party of the second part, as follows:

"The party of the first part hereby agrees to sell to the party of the second part, and the second party agrees to buy from the said party of the first part, all of the merchantable timber of every kind, now situate upon [certain lands].

"In consideration whereof, the said second party agrees to pay to said first party the sum of $2.85 per thousand feet for said timber; that he will cut and remove said timber from said land within one year from this date. The party of the second part agrees to commence logging operations upon said lands within thirty days from date hereof, and to fully complete the same within one year from date hereof, and to cause the logs cut from said land to be conveyed to the market and mills upon Grays Harbor and sold.

"Payment for said timber shall be made at the rate of $2.85 per thousand, at the time said logs are sold as follows: The first party has an option of being paid in cash, less two per cent or to take what is known as ninety day mill paper, at face value for said logs."

Twelve rafts of logs were cut and delivered to purchasing mills between May 29, 1915, and September 17, 1915. The proceeds from the sale of the first four rafts were deposited by the purchasers to Jensen's credit in respondent bank.

Under Jensen's instructions, cashier's checks to the extent of $2.85 per thousand feet board measure were mailed to Jensen, and he, in turn, sent them to appellant in accordance with the terms of the contract. Payment for the fifth raft was made by the purchasing mill company direct to Jensen. The proceeds received from the sales of the sixth, seventh, eighth, ninth and tenth rafts were deposited with, and retained by, respondent. No remittance to cover the contracted stumpage on these rafts was made, either by the bank or Jensen. It is to recover this amount that the present action was brought. The case was tried to the court without a jury, and resulted in a judgment of dismissal for the defendant.

Appellant first contends that respondent was an agent of Jensen's for the purpose of paying the stumpage, and that it should be permitted to recover as for money had and received; second, that the contract operated as an equitable assignment of the proceeds of the sales to the extent of $2.85 per thousand.

The record does not establish, in that degree of certainty that would warrant us in overturning the findings of the trial court, that there was an agency on the part of respondent either to collect or disburse all or any definite part of the proceeds of the sale of the several rafts for the account of Jensen or for the benefit of appellant. The testimony, when considered as a whole, warrants the conclusion, and no more, that respondent was acting under the direction of Jensen, and that it made such disbursements as it was from time to time directed by him to make. Some of the testimony given by Jensen would indicate that he expected respondent to pay the stumpage out of the proceeds, but this testimony, if otherwise sufficient, is greatly weakened by circumstances and by the conduct of Jensen, who collected and disbursed the proceeds of one or more rafts on his own account, and who must have known the state of his account with the bank. The testimony clearly shows that the bank was helping him to finance his enterprise even to the extent of allowing an

overdraft against rafts not yet made up or delivered.

There was no privity between appellant and the respondent. The obligation of the respondent to meet Jensen's contract with appellant must, if sustained at all, rest upon the grounds of an express direction on the part of Jensen to respondent to pay the stumpage first out of any funds coming into its hands. If we grant that there was such direction, we must grant that it was Jensen's lawful right to modify his instructions, either by act or direction. We have said that he collected and disbursed the proceeds of raft five without the aid of the bank. As for the remaining rafts, it cannot be said that there was any agency. Jensen says:

"Q. Did you have a subsequent arrangement with the bank as to these later rafts including raft 6 and subsequent rafts that as soon as these rafts were in tide water or it was certain that they were coming in, you could draw against them, against the prospective proceeds, in your checking account in the bank and that that money would be paid back? A. Yes, I did. We made those arrangements from time to time. Q. Now, what were those arrangements? A. Call Mr. Vandevort up and tell him it was necessary to draw against the account and tell him where the logs were. Perhaps they would be at the mill and the logs were not scaled yet or they were at the boom. Q. So you drew against the proceeds of the logs before the logs were at the market? A. I did sometimes. Q. Wasn't that the reason, Mr. Jensen, that there was no money left to pay stumpage because it had been drawn out? A. Yes, I expect that had a great deal to do with it. Q. Wasn't that the actual reason? A. Well, yes. . . . A. As I remember it, Mr. Vandevort told me at different times when I went down there just how I stood. Q. And that the stumpage was not paid? A. Yes. Q. And that you had overdrawn your account and there was not anything to pay it? A. Yes, sir. Q. You knew you were spending this money operating your camp. This money that should have gone to Vance, you spent it? A. Yes. Q. You came to my office Sunday of this week? A. Yes, sir. Q. And you met Mr. Vandevort there? A. Yes, sir. Q. And at that time didn't you say that the first charge against those logs at all times was to take care of the overdraft? A. Yes, sir,

I said that.   Q. And didn't you say also that every check you drew against that of any kind, except perhaps a little personal check, went to the operation of that logging camp, bills that had to be paid?  A. Yes, sir.  Q. Didn't you say also that if you had not had that fire?  .  .  .  Q.  Didn't you say that if you had not had that fire you would have had money to pay Vance?  A. I said that if it had not have been for the fire the logging operations up there would have been all right."

Counsel further contends that, inasmuch as Jensen had agreed to pay appellant $2.85 per thousand stumpage "at the time said logs are sold," and respondent knew that he had so agreed, it is to be charged as a trustee and is liable as for a conversion of a trust fund.   That a bank which diverts a trust fund to the payment of the personal debt of a depositor is liable to the true owner, is well settled by authority.

We find no element that would attach a trust to the specific fund.   The contract does not, in any way, reserve an interest in the logs sold, or the fund to be realized therefrom.   Appellant is not, as to third parties, either the legal or equitable owner of the fund.   The relation of debtor and creditor exists between Jensen and appellant, and nothing more.   No lien is reserved; nor does the contract even provide that appellant shall have the first proceeds from the sale of the rafts.   If Jensen had used the proceeds—as he did part of them—to pay for the expenses of logging, it could not for a moment be asserted that the ones who had been paid were bound to account to appellant although it was shown that they knew the terms of the contract.   Neither can an equitable title be asserted as against other creditors who furnished money to carry on the work, or contributed to Jensen's general credit and needs pending the performance of the contract.   This feature of the case is disposed of by the reasoning of the court in *Hossack v. Graham,* 20 Wash. 184, 55 Pac. 36.

Affirmed.

MORRIS, C. J., MAIN, ELLIS, and PARKER, JJ., concur.